## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Honora Tremaine Patterson, | Civil No. 17-2263 (DSD/BRT) |
| Plaintiff, | |
| v. | **\*SEALED\*** <br> **REPORT AND** <br> **RECOMMENDATION** |
| Emmanual Kintu; Nick DeChene; Dan Meyer; Tim Demulling;[1] Aoun Noor; John Spielman; John Ricci; Chris Roth; and John Does, each sued in their personal capacities, | |
| Defendants. | |

Honora Tremaine Patterson, OID # 237000, 5329 Osgood Ave N., Stillwater, MN 55082, *pro se* Plaintiff.

Bradley Simon, Esq., Assistant Attorney General, counsel for Defendants.

BECKY R. THORSON, United States Magistrate Judge.

Plaintiff Honora Tremaine Patterson, a Minnesota state prisoner, alleges that prison officials used excessive force against him in violation of his Eighth Amendment rights and subsequently lied on their reports of the event. Defendants Emmanual Kintu,

---

[1]    The original Complaint was unclear whether Defendant's name was spelled "Demolling" or "Demulling." (*See* Doc. No. 1, Compl.) The docket reflects the first spelling, but the documents submitted in this case show that the correct spelling of Defendant's name is in fact Demulling. (Doc. No. 67, Affidavit of Timothy Demulling ("Demulling Aff.").)

Nick DeChene, Dan Meyer, Tim Demulling, Aoun Noor, John Spielman, John Ricci, and Chris Roth seek summary judgment on Plaintiff's claims. (Doc. No. 63.) For the reasons stated below, this Court recommends that Defendants' motion for summary judgment be granted and that this matter be dismissed.

## I.    Background[2]

Plaintiff has been in the custody of the State of Minnesota at all times relevant to this lawsuit.[3] (Doc. No. 80, Affidavit of Sherlinda Wheeler ("Wheeler Aff.") ¶ 3, Ex. 1.) Although Plaintiff denies being "a troublemaker" during his incarceration, (*see* Doc. No. 96, Pl.'s Mem. 1), he has compiled a lengthy record of misconduct while serving his sentence, including a conviction for fourth-degree assault after throwing bodily waste at a correctional officer. (Wheeler Aff. ¶ 5, Ex. 3.) In another incident prior to the events at issue in this litigation—an incident which Plaintiff admitted had occurred during prison disciplinary proceedings—Plaintiff asked to be examined by a nurse, but then refused to comply with directives; he was later heard commenting "Those b*****s are lucky they didn't come in here! I would of broke their motherf*****g necks!" (Wheeler Aff. ¶ 6, Ex. 4 at 2.) On fourteen separate occasions between 2014 and the events at issue in this litigation, Plaintiff was charged and found guilty of disciplinary infractions while incarcerated. (Wheeler Aff. ¶ 7, Ex. 6 at 2–3.) As mentioned above, one of those

---

[2]    Except as otherwise indicated, the following facts are not disputed by the parties.

[3]    Plaintiff pled guilty to second-degree murder and was sentenced to 386 months in prison on March 7, 2014. (Wheeler Aff. ¶ 3, Ex. 1.)

infractions—an assault of a prison guard—resulted in a criminal conviction. (Wheeler Aff. ¶ 5, Ex. 3.)

This history of misconduct landed Plaintiff at the Minnesota Correctional Facility at Oak Park Heights ("MCF-OPH"), the highest security facility in the State of Minnesota. (Wheeler Aff. ¶ 6.) On April 30, 2017—the day on which the events at issue in this litigation took place—Plaintiff resided in Complex 5 of MCF-OPH, which is one of two disciplinary segregation units within that facility. (*Id.* ¶¶ 9–10.) Put another way, on the date of the events described below, Plaintiff's past behavior had resulted in him being housed in one of the most secure units in Minnesota's most secure prison.

 On April 30, 2017, prison staff activated an Incident Command System ("ICS") call when Plaintiff was found unresponsive in his cell.[4] (Doc. No. 69, Affidavit of Daniel Meyer ("Meyer Aff.") ¶ 7.) Prison staff directed Plaintiff to come to the cell door and place his hands out of the book pass—a rectangular opening used to safely pass materials into and out of the cell—in preparation for prison officials to safely enter the cell. (*Id.* ¶ 9.) After some initial resistance, Plaintiff complied with the directive and was handcuffed. (*Id.* ¶ 10; Wheeler Aff. ¶ 11, Ex. 7.)[5] Plaintiff stated that he "felt dizzy &

---

[4]    Defendants describe Plaintiff as laying on the floor of his cell, while Plaintiff says that he "was sitting on the floor, not laying." (Pl.'s Mem. 2.)

[5]    Exhibit 7 to the Wheeler Affidavit is a copy of the video recording related to the initial April 30, 2017 ICS call involving Plaintiff. (Wheeler Aff. ¶ 11, Ex. 7.) Exhibit 8 is a copy of the video recording related to the second April 30, 2017 ICS call involving Plaintiff. (Wheeler Aff. ¶ 12, Ex. 8.) This video is taken with a handheld camera. (*Id.*) Exhibit 9 is a copy of the video recording from the stationary camera inside the cell to which Plaintiff was taken. (Wheeler Aff. ¶ 13, Ex. 9.)

passed out because his blood pressure [was] high." (Wheeler Aff. ¶ 17, Ex. 13 at 8.) A nurse examined Plaintiff, took his vital measurements, noted nothing unusual, and left the cell. (*Id*.)

About an hour later, prison officials activated another ICS when Plaintiff was again found unresponsive in his cell. (Meyer Aff. ¶ 11.) As before, Plaintiff was directed to go to the book pass so that he could be restrained before prison staff entered the cell. Plaintiff, however, did not comply with the request; in fact, Plaintiff did not respond at all. (*Id*. ¶ 16.) Defendant Dan Meyer, the watch commander at the time of the incident, concluded that Plaintiff was feigning unconsciousness and, rather than ordering what he regarded as a potentially risky cell entry by prison officials to check on Plaintiff, authorized the use of a chemical irritant in an attempt to get Plaintiff to comply. (*Id*. ¶¶ 16–17.) After being given a warning that the chemical was about to be sprayed into his cell,[6] Plaintiff remained unresponsive. (*Id*. ¶ 17.)

Consistent with the warnings, Defendant Tim Demulling sprayed Plaintiff with the chemical irritant in two short bursts. (Meyer Aff. ¶ 18; Demulling Aff. ¶ 9.) The formerly

---

[6]     Plaintiff insists that he "was sprayed without warning," (Pl.'s Mem. 2), but this is contradicted by the video recording the incident. (*See* Wheeler Aff. ¶ 12, Ex. 8 (video recording related to second April 30, 2017 ICS call involving Plaintiff).) "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The record conclusively establishes that prison officials gave warnings that chemical irritant would be used if Plaintiff did not comply with directives. Whether Plaintiff *heard* those warnings—that is, whether Plaintiff was truly unconscious when sprayed—is not clearly established by the evidence in the record.

unresponsive Plaintiff began coughing and moved back in his cell towards the bed. (*Id.*) Prison officials again directed Plaintiff to place his hands through the book pass in order to be restrained. (*Id.*) This time Plaintiff complied. (*Id.*)

Because of Plaintiff's behavior and disturbances in nearby cells by other persons, Defendant Meyer decided to move Plaintiff to an observation unit. (Meyer Aff. ¶ 20.) Plaintiff was placed in handcuffs and a waist chain and was accompanied to the observation cell by (among others) Defendants Emmanual Kintu and Tim Demulling. (Wheeler Aff. ¶ 12, Ex. 8.) A nurse then entered the observation cell to assess Plaintiff's medical condition. (*See id.*; Meyer Aff. ¶ 22.) By his own admission, Plaintiff then lunged at Kintu. (Pl.'s Mem. 3.) Video taken from the observation cell confirms that Plaintiff made a sudden and forceful move towards Kintu shortly after entering the cell, hitting Kintu and knocking him into the wall. (Wheeler Aff. ¶ 13, Ex. 9.) Kintu attests that Plaintiff also spit into his face and mouth. (Doc. No. 68, Affidavit of Emmanual Kintu ("Kintu Aff.") ¶ 11.) Plaintiff denies in his briefing that he spit on Kintu, though he did admit during prison disciplinary proceedings that "I spit after they beat me." (Wheeler Aff. ¶ 14, Ex. 10 at 5.)

Prison staff activated another ICS, this time for an ongoing staff assault. (Doc. No. 74, Affidavit of Aoun Noor ("Noor Aff.") ¶ 13.) Officers inside the cell immediately attempted to restrain Plaintiff, and several officers outside the cell rushed in to assist. The *exact* events that followed are both unclear and disputed. Kintu attests that Plaintiff grabbed his arm while he was attempting to restrain Plaintiff, but Plaintiff suggests that

he never grabbed Kintu's arm. (*See* Kintu Aff. ¶ 12; Pl.'s Mem. 3–4.)[7] Several of the Defendants then used substantial force against Plaintiff in attempting to restrain him — force that Plaintiff claims was excessive under the circumstances. Defendant Demulling threw several closed fist punches that hit Plaintiff's solar plexus and face. Demulling also kneed Plaintiff several times "in the ribs and upper hip area." (Demulling Aff. ¶ 18.) Plaintiff alleges that Demulling acted with intent to injure him, though Demulling denies this, asserting that he was aiming for "Patterson's brachial plexus tie in, which is a pressure point located near where the shoulder meets the armpit." (Demulling Aff. ¶ 14.) Defendant John Ricci, who entered the cell after Plaintiff lunged at Kintu, also threw punches at Plaintiff, which were aimed at and landed on Plaintiff's leg and knee. (*See* Doc. No. 75, Affidavit of John Ricci ("Ricci Aff.") ¶ 16.) Ricci attests that these punches were delivered "to stop Patterson from resisting and kicking his legs," though Plaintiff denies that he was resisting at the time that the punches were thrown. (*Id.*) Defendant Kintu also threw punches at Plaintiff, which landed on Plaintiff's face; again, Kintu attests that this was done because Plaintiff had grabbed his arm and refused to release it. Finally, Plaintiff alleges that Defendant DeChene—who had previously been recording the incident on camera—punched, used a "knee drop," and applied a choke hold to him. (Pl.'s Mem. 5.)

---

[7]     Plaintiff is somewhat ambiguous on the issue of whether he did, in fact, grab Kintu's arm during the altercation. (*See* Pl.'s Mem. at 3-4 ("Defendant Kintu never reported in his report that he had to use force and that I the Plaintiff grab his forearm and wouldn't let go.").)

Prison staff eventually placed Plaintiff under full restraints and walked him to the MCF-OPH Administrative Control Unit. (Demulling Aff. ¶ 21.) Plaintiff was examined by a nurse, who noted both that Plaintiff's left eye sclera and lower lip were bloody and that Plaintiff's lower lip and cheek bones were beginning to swell. (Wheeler Aff. ¶ 17, Ex. 13 at 7.) The nurse described this swelling as mild. (*Id.*) Doctor records from two days after the incident noted "1. Left periorbital contusion. 2. Scleral hemorrhage, left eye. 3. Abrasions, oropharyngeal area, potentially related to patient's documented coughing when exposed to chemical irritant. 4. Diminished sensation, lateral aspects of wrists, per patient, potential to superficial nerve contusion." (*Id.* at 4.) The doctor gave Plaintiff Tylenol, throat lozenges, and B complex vitamins. (*Id.* at 5.)[8]

About a month later Plaintiff returned to the doctor and reported back and ankle pain, but he also noted that he "recall[ed] no activity or trauma which preceded the onset of this pain" and that the pain "began two days *before* an altercation with staff on April 28, 2017."[9] (Wheeler Aff. ¶ 17, Ex. 13 at 5) (emphasis added). About a month after that, Plaintiff reported headaches on June 28, 2017. (*Id.* at 2.) Medical notes indicate that Plaintiff's headaches were potentially post-traumatic and potentially post-concussive.

---

[8]     That evening, Plaintiff was involved in another incident where he became angry and made verbal threats against staff, including saying "I'm gonna hurt one of you m***** f******" and "Once I get back to population I'm knocking one of you m***** f****** out! Y'all don't know who I am!" (Wheeler Aff. ¶ 16, Ex. 12.) Plaintiff received an additional thirty days of segregation time for threatening others and disorderly conduct. (*Id.*) These facts do not weigh into whether excessive force was used.

[9]     Presumably, the doctor was referring to the altercation that occurred on April 30.

(*Id.*) Subsequent records from a medical appointment in September 2017 reflect no other concerns regarding injuries arising out of the April 30, 2017 altercation. (*Id*. at 1–3.)

Plaintiff later described his own injuries from the incident as being "a bust scleral hemorrhage in my left eye, black left eye and swollen left eye and right eye, swollen and bust nose and swollen and bust lip, bruises under my neck." (Doc. No. 84, Affidavit of Bradley Simon ("Simon Aff.") ¶ 2, Ex. 1 at 3.) Plaintiff also stated that, as of about a year after the incident, his "physical injuries [had] somewhat improved but I still have discomfort," including headaches and back discomfort. (*Id*. at 4.)

## II. Analysis

### A. Standard of Review

Summary judgment is appropriate if the evidence in the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Thomas v. Heartland Emp't Servs., LLC*, 797 F.3d 527, 529 (8th Cir. 2015). The moving party bears the initial burden of informing the court of the basis for its motion and identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2011). If the moving party does so, the nonmoving party "may not . . . rest on mere allegations or denials," but must point to evidence "of specific facts which create a genuine issue of material fact." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). The mere existence of a factual dispute will not defeat a motion for summary judgment unless that dispute is "genuine," meaning that "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a summary-judgment motion, a court need not accept a nonmoving party's unsupported allegations, *see Reed v. City of St.Charles, Mo.*, 561 F.3d 788, 790–91 (8th Cir. 2009), conclusory statements, *see Heisler v. Metro. Council*, 339 F.3d 622, 628 (8th Cir. 2003), or other statements that are "blatantly contradicted by the record," such that "no reasonable jury could believe" them. *Edwards v. Byrd*, 750 F.3d 728, 733 (8th Cir. 2014); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

### B.    Defendants Noor, Spielman, and Roth

Plaintiff alleged in his Amended Complaint that Defendants Noor, Spielman, and Roth used excessive force against him by holding him down on his bed, "punching [him] all over [his] body and face," and pulling him off the bed onto the floor while shackled. (Doc. No. 40, Am. Compl. at 4.) Plaintiff acknowledges, however, that after reviewing the evidence, Noor, Spielman, and Roth "did not use any force against me" and "did their job in restraining me and not striking me for no reason." (Doc. No. 98, Declaration of Honora Tremaine Patterson ("Patterson Decl.") ¶ 14.) Obviously, then, excessive-force

claims cannot be prosecuted against those individuals, as Plaintiff himself recognizes.[10]
*Id.*

Plaintiff suggests that despite the dismissal of the excessive force claims against Noor, Spielman, and Roth, he might nevertheless be able to prosecute claims that those officers included false information in their incident reports following the events at issue in this litigation. (Patterson Decl. ¶ 14.) But Plaintiff did not plead claims regarding false reports against Noor, Spielman, or Roth in his Amended Complaint, and thus any such claims cannot properly be regarded as part of the current litigation. (*See generally* Am. Compl.) Moreover, as will be explained with respect to the claim about false incident reports that Plaintiff *did* plead against Kintu, the submission of an incident report containing false information does not, by itself, amount to actionable misbehavior, even assuming Plaintiff's allegations to be correct. Accordingly, this Court recommends that Defendants Noor, Spielman, and Roth be dismissed from this lawsuit.

---

[10]    In the Declaration attesting that "Noor, Roth, and Spielman . . . did not use any force against me," Plaintiff asks that "this Court drop [the] excessive [force] claim against Defendants Noor, and Roth and *Ricci*." (Patterson Decl. ¶ 14) (emphasis added). Plaintiff's inclusion of Ricci in place of Spielman appears to be a scrivener's error. Elsewhere in the same Declaration, Plaintiff attests that Ricci "started striking in leg and knee area for no reason." (*Id.* ¶ 12.) No similar statements are made with respect to Spielman. Similarly, in his briefing Plaintiff argues that Ricci used unnecessary force, but also noted that it "seem[s] defendant Spielman did not strike me." (Pl.'s Mem. 7.) Accordingly, this Court declines to regard the excessive-force claim against Ricci as voluntarily dismissed, notwithstanding the statement in Plaintiff's Declaration that, if read literally, would require Ricci's dismissal. That said, as explained later in this Report and Recommendation, it is recommended that Ricci's motion for summary judgment be granted because there is insufficient evidence in the record for a reasonable factfinder to conclude that Ricci (or anyone else) used excessive force against Plaintiff.

### C.    Defendants Kintu, DeChene, Demulling, and Ricci

Unlike Noor, Spielman, and Roth, Defendants Kintu, DeChene, Demulling, and Ricci each personally used force against Plaintiff that he claims was excessive under the circumstances. Demulling sprayed Plaintiff with chemical irritant when Plaintiff failed to respond to the directive that he place his hands in his cell's book pass. In addition, all four officers were involved in restraining Plaintiff after he lunged at Kintu in the observation cell.

Along with the claims of excessive force, Plaintiff alleges in his Amended Complaint that Kintu falsified information on the report he filed following the events at issue. (Am. Compl. 4.) Although the Amended Complaint did not expressly raise a claim based on that specific allegation, the brief submitted by Plaintiff in opposition to Defendants' motion for summary judgment suggests that, *independent* of his excessive-force claims, he is seeking relief based on the allegation that Kintu filed a false report. (Pl.'s Mem. 3.) Plaintiff also alleges in his briefing that several of the other officers included false information on their reports. Despite the lack of clarity about whether Plaintiff is raising a legal claim based on the allegations of false reports, this Court will consider this claim as though it had been expressly and adequately raised. *See* Part II, Section D.

### 1.    Legal Standard: Excessive Force Claims

"[T]he Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences." *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000) (citing *Whitley v. Albers*, 475 U.S. 312, 318-22

(1986)). "Only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley*, 475 U.S. at 319. "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Id.* Thus, when a court determines whether a correctional officer's force was excessive and in violation of the Eighth Amendment, the court must determine "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992); *see also Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008).

"[P]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and to maintain institutional security." *Hudson*, 503 U.S. at 6. Evidence that "prison officials arguably erred in judgment" in deciding to use even deadly force "falls far short of a showing that there was no plausible basis for [their] belief that this degree of force was necessary." *Whitley*, 475 U.S. at 323. If the evidence shows only "a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives . . . the case should not go to the jury." *Id.* at 322; *see also Jackson v. Gutzmer*, 866 F.3d 969, 974–75 (8th Cir. 2017). Ultimately, a prison official is entitled to summary judgment on a claim of excessive force unless the evidence, viewed in the light most favorable to the plaintiff, supports a "reliable

12

inference" that force was applied maliciously and sadistically for the purpose of causing harm. *Whitley*, 475 U.S. at 322.

### 2. Use of Chemical Irritant Did Not Violate the Eighth Amendment

Plaintiff contends that the use of chemical irritant by Demulling amounted to excessive force under the circumstances. "[A] limited application of [chemical irritant] to control a recalcitrant inmate constitutes a 'tempered response by prison officials' when compared to other forms of force." *Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000) (quoting *Whitley*, 475 U.S. at 321 (footnote omitted)). "Used in such manner and purpose, its application should 'rarely be a proper basis for judicial oversight.'" *Id*. (quoting *Colon v. Schneider*, 899 F.2d 660, 669 (7th Cir. 1990)). "[T]he few cases where we denied summary judgment in Eighth Amendment excessive force claims based on pepper spraying have involved no warning this force would be used, no apparent purpose other than inflicting pain, use of unnecessary 'super-soaker' quantities of the chemical, refusal to allow the victim to wash off the painful chemical for days, and/or use of additional physical force." *Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014) (citing *Walker v. Bowersox*, 526 F.3d 1186, 1189 (8th Cir. 2008); *Treats v. Morgan*, 308 F.3d 868, 873 (8th Cir. 2002); *Lawrence v. Bowersox*, 297 F.3d 727, 730, 732 (8th Cir. 2002)).

None of the factors identified by the Eighth Circuit as indicating excessive force in the use of chemical irritant are present here. Plaintiff does not allege that excessive

amounts of irritant were used. The chemical was removed within minutes. And the use of the chemical irritant was not accompanied by other physical force.[11]

The circumstances facing officers when they found Plaintiff unresponsive in his cell were as follows: Plaintiff had a lengthy history of disciplinary problems while incarcerated, including assault on prison staff. (*See, e.g.*, Wheeler Aff. ¶ 5, Exs. 3-4.) Approximately an hour before the events that led to the use of chemical irritant, Plaintiff had been found unresponsive, eventually complied with directives, was examined by a nurse, and determined to have had no urgent medical needs. (Wheeler Aff. ¶ 17, Ex. 13 at 8.) Other prisoners, though admittedly not Plaintiff, have used medical checks as a pretense to commit acts of violence against prison staff. (Meyer Aff. ¶ 14.) And Plaintiff had previously threatened violence against prison medical staff. (Wheeler Aff. ¶ 6, Ex. 4 at 2.)

Staff had few options after Plaintiff was unresponsive to multiple orders to come to the door. One option was to "perform a cell entry." (Def. Br. at 4.) But, due to Plaintiff's prior history, cell entry would have required the participation of several officers and Plaintiff's forcible restraint, a process with the potential to result in serious injury both to the prisoner and to prison staff. (Meyer Aff. ¶¶ 13-17.) Defendant Meyer knew that Plaintiff had recently been evaluated by a nurse for the same alleged condition,

---

[11]    Officers *later* used physical force against Plaintiff, after he had been transferred from his cell, but this use of force was separate from the use of irritant. Whether that later use of physical force could be reasonably found to have been excessive under the circumstances is examined below.

and she had determined that Plaintiff did not require further medical attention. In addition, Meyer and others observed that Plaintiff was breathing and moving his hands. It was only when Plaintiff failed to respond that Meyer authorized staff to use the irritant.[12]

There is no dispute that Meyer's decision to deploy chemical irritant into the officer's cell was authorized by DOC policy. While Plaintiff claims he was not warned, he also claims that he was unconscious until he woke up to the spray. (*See* Pl.'s Mem. 2 ("I got up off the bed then passed out and wake up to chemical agents being sprayed in my face."); Simon Aff. ¶ 2, Ex. 1 at 4 ("I was sprayed while unresponsive.").) If Plaintiff had in fact lost consciousness, he could not possibly know (as he now alleges) whether officers gave any warnings that the chemical irritant was about to be used. On the other hand, Defendants' version of the facts is supported by the video of the incident. (*See* Wheeler Aff. ¶ 12, Ex. 8) ("You're going to get a little chemical in the eyes. Come up here.").) Based on that evidence, no reasonable jury could believe Plaintiff's claim that no warning was given. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

---

[12]    Indeed, although prison staff could not have known it at the time—and thus this cannot factor into considerations of Defendants' intent—many of the fears that motivated the use of chemical irritant against Plaintiff proved to be well-founded after Plaintiff unexpectedly—and violently—assaulted Defendant Kintu.

Without other evidence supporting a "reliable inference" that force was applied maliciously and sadistically for the purpose of causing harm, the excessive force claim fails.

### 3. Use of Physical Force by Defendants Kintu, Demulling, Ricci, and DeChene in Restraining Plaintiff After Plaintiff Assaulted Kintu

As discussed above, after the chemical irritant was sprayed, Plaintiff eventually complied with the directive to place his hands through the book pass and was restrained for another medical examination. During this time, other inmates in nearby cells started yelling and kicking their doors. Defendant Meyer decided to move Plaintiff to an observation unit. (Meyer Aff. ¶ 20.) Plaintiff was placed in handcuffs and a waist chain and was accompanied to the observation cell by several staff members. (Wheeler Aff. ¶ 12, Ex. 8.)

Once in the observation cell, Plaintiff repeatedly asked "what the f**k is this." (Doc. No. 98, Patterson Decl. ¶ 7.)[13] As depicted in the videos, the observation cell had a door at one end and a bed at the other. (Wheeler Aff. ¶¶ 12–13, Exs. 8–9.) A nurse entered the cell and approached Plaintiff to assess his medical condition. (*See id.*; Meyer Aff. ¶ 22.) Plaintiff was facing the nurse with his back to the bed. (Wheeler Aff. ¶¶ 12–13, Exs. 8–9.) Kintu was at Plaintiff's right, and Demulling at Plaintiff's left. (*Id.*) Plaintiff admits that he lunged at Defendant Kintu. (*Id.*) Kintu initially believed he was

---

[13]    According to Plaintiff, he had a "verbal altercation with defendant Kintu." (Pl.'s Mem. 3.) It is unclear what the verbal altercation was.

16

"head-butted"; however, after he viewed the video, Kintu acknowledged that Plaintiff's blow was made with his body. (*See* Kintu Aff. ¶ 11.) The video clearly depicts Plaintiff lunging and violently knocking Kintu into the wall. (*See* Wheeler Aff. ¶ 13, Ex. 9.) Several officers immediately swarmed Plaintiff. (*Id.*)

Several of the officers, including Kintu, Demulling, and Ricci, threw closed-fist punches while wrestling Plaintiff into submission on the bed. (Wheeler Aff. ¶¶ 12–13, Exs. 8–9.) Demulling struck Plaintiff with his knee. (*Id.*) Plaintiff was pulled from the bed to the floor. (*Id.*) Defendant DeChene moved into the cell to replace Kintu. (*Id.*) Because of the close quarters, Defendant DeChene crawled around the side of the cell and up onto the bed to assist. (*Id.*) Defendant DeChene then dropped onto the floor with Plaintiff and the other officers, allegedly striking Plaintiff with his knee and choking him. (*See id.*) After placing Plaintiff into full restraints, Plaintiff was brought to his feet and walked under tight guard to another room for a medical examination. (*Id.*)

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishment Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7. "Factors to be considered in deciding whether a particular use of force was reasonable are whether there was an objective need for force, the relationship between any such need and the amount of force used, the threat reasonably perceived by the correctional officers, any efforts by the officers to temper the severity of their forceful response, and the extent of the

inmate's injury." *Treats*, 308 F.3d at 872 (citing *Hudson*, 503 U.S. at 7). An analysis of the relevant factors does not support Plaintiff's excessive force claim here.

First, "there was an objective need for force." *Treats*, 308 F.3d at 872. Plaintiff admits that he lunged at Defendant Kintu. The video of the altercation also shows that Plaintiff suddenly and violently lunged towards Kintu, knocking him backwards into a brick wall in the process. (*See* Wheeler Aff. ¶ 13, Ex. 9.) And, at the time, the nurse was in the cell, immediately in front of Plaintiff when Plaintiff assaulted Kintu. (*See id.*)

Second, the "relationship between any such need and the amount of force used," *Treats*, 308 F.3d at 872, shows that the force was applied in a good-faith effort to maintain or restore discipline. Plaintiff claims that he was hit with closed fists and knee blows and choked after he was restrained, when he was not posing a threat to anyone. Defendants claim that they applied only the force necessary after Plaintiff assaulted Kintu and resisted Defendants' attempts to subdue him.

The video images do not clearly show all of the contact between the officers and Plaintiff after Plaintiff attacked Kintu. However, the video and audio evidence confirms that the officers were still struggling to restrain Plaintiff after he was pushed onto the bed and pulled to the floor. (Meyer Aff. ¶ 27; *see also* Wheeler Aff. ¶ 13, Ex. 9.) And, while Plaintiff denies spitting at Kintu, Kintu can be heard stating, "he spit in my f*****g mouth, man." (Wheeler Aff. ¶ 12, Ex. 8.) Later, Plaintiff admitted spitting at staff. (Wheeler Aff. ¶ 15, Ex. 11.) Though the video images are not always clear, the video's audio reflects that Plaintiff was instructed multiple times to keep his legs down and leg restraints were ordered while he was on the floor. (Wheeler Aff. ¶¶ 12–13, Exs. 8–9.)

After that, a voice saying "stop resisting" can be heard, indicating that the officers were still trying to restore order. (*Id.*)[14]

Even if Defendants overreacted to the actual threat posed by Plaintiff, any errors of judgment on their part do not support a finding that the Defendants used force with malicious and sadistic intent. *See Whitley*, 475 U.S. at 322–24 (emphasizing that negligence and "ordinary errors of judgment" do not rise to the level of an Eighth Amendment violation.)[15] The methods employed to restrain Plaintiff following Plaintiff's violent assault of Kintu were consistent with official policy regarding use of force against belligerent detainees. (Meyer Aff. ¶ 17, Ex. 3.) While prison procedures cannot overstep constitutional bounds, the fact that prison policies regarding use of force—policies contemplated and enacted outside the heat of any particular altercation—recognize the methods employed by the officers as legitimate techniques weighs in favor of finding the force was not excessive.[16]

---

[14]    Kintu and the other officers claim that Plaintiff had grabbed hold of Kintu's arm and would not let go. It is unclear whether Plaintiff disputes that he took hold of Kintu's arm. This Court's Recommendation does not assume that Plaintiff grabbed Kintu's arm and relies on the response to Plaintiff's attack on Kintu and other evidence of the struggle that followed.

[15]    Plaintiff also argues that Defendant Demulling "wasn't in his right state of mind" because Demulling stated that he "saw red" during the altercation. (Pl.'s Mem. 6.) "When a person compare they self to a raging bull and say they saw red they intention is to hurt someone and that's he did hurt me." (*Id.*) Plaintiff's unsupported opinions about Defendants' intent are insufficient to defeat summary judgment. *See Jackson*, 866 F.3d at 974–75; *Wilson v. Northcutt*, 441 F.3d 586, 592–93 (8th Cir. 2006).

[16]    Plaintiff concludes that the staff response to the assault of a corrections officer was not appropriate because "Warden Smith recommended an individual meeting and tactical

Third, an examination of the "threat reasonably perceived by the correctional officers," *Treats*, 308 F.3d at 872, does not support Plaintiff's excessive force claim. There is no dispute that the officers were dealing with the violent assault of a guard by Plaintiff. Moreover, Defendants were also aware of Plaintiff's history of conduct, which included multiple assaults of prison staff. (Wheeler Aff. ¶ 7.) "[O]fficers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. Plaintiff's argument that he posed no threat because he was in a waist-chain and handcuffs is belied by the undisputed evidence that Plaintiff violently attacked Kintu while in these restraints.

Fourth, there is evidence of "efforts by the officers to temper the severity of their forceful response." *Treats*, 308 F.3d at 872. During the altercation, the officers were instructed by another correctional officer on the steps they should take to control the situation. For example, the officers were told to "pull [Plaintiff] to the floor." (Wheeler Aff. ¶ 12, Ex. 8.) They were also instructed to get his head down. (*Id.*) After Plaintiff was

---

briefing." (Pl.'s Mem. 9.) The corresponding notes indicate that staff had difficulty due to Plaintiff's "active resistance." (Patterson Decl., Ex. 1 at 25.) The notes also confirm that DeMulling and DeChene utilized nerve strikes but missed their targets. (*Id.*) Assuming that a "better response" could have been made does not mean that the officers' response was intended to maliciously and sadistically injure Plaintiff. *See Whitley*, 475 U.S. at 322 (explaining that the "existence of arguably superior alternatives" is not enough to support a claim of excessive force in an institutional setting); *Dillon v. Brown Cnty., Neb.*, 380 F.3d 360, 364 (8th Cir. 2004) (noting that there is "hesitancy to critique in hindsight necessarily made in haste, under pressure, and frequently without the luxury of a second chance").

pulled to the floor, they were instructed to "flip him over." (*Id.*) They were also instructed to be cool. (*Id.*) After full restraints were applied, Plaintiff was brought to his feet and he walked while being escorted to a different area of the facility without any further force. (*Id.*) Indeed, Plaintiff makes no allegations of excessive force once he was placed in full restraints and most vulnerable. Thus, the analysis of this factor does not show that Defendants used force "maliciously and sadistically to cause harm."

Finally, the "extent of the inmate's injury" does not show that force was used in a malicious and sadistic manner either. Plaintiff's injuries do not contradict Defendants' version of events. Plaintiff's primary injuries consisted of abrasions, mild swelling, and other skin-deep maladies. (Wheeler Aff. ¶ 17, Ex. 13 at 7.) The long-term injuries claimed by Plaintiff appear to be back discomfort and headaches. (*See id.* at 1–3; Simon Aff. ¶ 2, Ex. 1 at 4.) His back discomfort, however, began prior to the incident. About a month after the incident, Plaintiff reported headaches, which Plaintiff attributed to the incident. According to the medical notes, Plaintiff alleged that he lost consciousness during the incident, however, no corresponding medical notes of a head injury were found. (Wheeler Aff. ¶ 17, Ex. 2 at 2.) The most recent medical report does not mention headaches. (*Id.* at 1.) While this Court in no way concludes that Plaintiff's injuries are *de minimis*, they are consistent with the officers' explanation of the force used. Accordingly, Plaintiff's injuries, without more, do not establish that Defendants used force "maliciously and sadistically to cause harm," rather than in "a good-faith effort to maintain or restore discipline."

When evaluating these factors, it is important to bear two principles in mind. First, the use of force does not violate the Eighth Amendment simply because it appears, particularly in hindsight, to have been objectively unreasonable "and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319. Rather than focusing on the objective necessity or "reasonableness of a particular use of force," including "the existence of arguably superior alternatives," the Eighth Amendment question asks whether "the use of force *could plausibly have been thought necessary*, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 321 (emphasis added); *see also William v. Benjamin*, 77 F.3d 756, 763–64 (4th Cir. 1996) ("[T]he necessity of the [defendants'] actions is not the proper focus of the inquiry. Instead, we focus on whether the evidence supports the inference that the [defendants] wantonly punished [the plaintiff]."). A prisoner must therefore show that "there was no plausible basis" for believing that the use of force was necessary to maintain order or security; a showing of negligence or "ordinary errors of judgment" are not enough. *Whitley*, 475 U.S. at 322–23; *see also Hickey v. Reeder*, 12 F.3d 754, 758 (8th Cir. 1993). Plaintiff has not met his evidentiary burden with respect to any of the Defendants. "If the evidence shows only 'a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives . . . the case should not go to the jury.'" *Jackson*, 866 F.3d at 975 (quoting *Whitley*, 475 U.S. at 322). This is precisely the case here. Simply put, Plaintiff has not offered evidence to contradict that correctional officers reasonably perceived an ongoing

threat by Plaintiff until he was placed in full restraints following his assault on Defendant Kintu. *See Whitley*, 475 U.S. at 321.

Further, "[w]hen the ever-present potential for violent confrontation and conflagration ripens into *actual* unrest and conflict, the admonition that a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators carries special weight." *Whitley*, 475 U.S. at 321. Wide-ranging deference is given. *Id*. at 321–22. "That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Id.* at 322. Prison staff used techniques approved under official policy to bring into compliance an inmate who, just moments before, had physically assaulted a guard. A reasonable factfinder could not conclude that the officers' use of force in restraining Plaintiff amounted to an unconstitutional punishment. Defendants' motion for summary judgment should be granted.

### 4.    Qualified Immunity

Defendants also argue that they are entitled to qualified immunity. (Doc. No. 64, Defs.' Mem. 27–32.) Because Plaintiff fails to establish an Eighth Amendment violation, he cannot overcome a qualified immunity defense on summary judgment. *See Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009) (explaining that to overcome

a qualified immunity defense, a plaintiff must show that "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation"). If the facts do not show a violation, this Court need not proceed further with the qualified immunity analysis. *Brockington v. City of Sherwood*, 503 F.3d 667, 672 (8th Cir. 2007).

### D.    False Information on Reports

Finally, Plaintiff alleges that several of the officers should be held liable for the inclusion of false information in their reports following the events at issue. Plaintiff focuses specifically on three statements found in the reports. First, though some of the reports stated that Plaintiff grabbed Kintu's arm during the course of the altercation, a few of the officers state that they did not see that Plaintiff had grabbed Kintu's arm. Plaintiff uses this discrepancy to suggest either that he did not in fact grab Kintu's arm, or that he did grab Kintu's arm and this was merely used as pretext for the use of excessive force after the fact. Second, Kintu reported that Plaintiff spit on him, while Plaintiff insists that he did not, despite having earlier admitted that he had "spit after they beat me." (Wheeler Aff. Ex. 10 at 5.) Third, Kintu stated in his report that Plaintiff headbutted him while lunging at him; the video of the incident revealed that, although Kintu was knocked backwards by the lunge, Plaintiff's *head* did not make contact with Kintu.

As an initial matter, it is far from clear that the information included in the reports cited as false by Plaintiff is, in fact, false. The evidence in the record neither conclusively proves nor disproves that Plaintiff grabbed Kintu's arm or spit on him. Moreover, to the extent that the information is false, it is similarly far from clear that the information was

known to be false at the time it was written by Defendants. The video from the incident shows that the altercation instigated by Plaintiff was chaotic; it is entirely reasonable that the officers may have misinterpreted some of the events that occurred in the immediate aftermath of the altercation. Thus, for example, Kintu was incorrect in writing that Plaintiff had headbutted him, but it is hardly obvious that Kintu knew this was false when he filed the report. After all, Plaintiff had quickly lunged towards Kintu and, in so doing, forced Kintu back violently against the wall. (*See* Wheeler Aff. ¶ 13, Ex. 9 (video of altercation).) That Kintu described the contact as a headbutt rather than a forearm to his sternum was incorrect, but there is little reason to believe that the erroneous description was anything other than a simple mistake.

But even leaving all that aside, "[t]he filing of a false disciplinary charge is not itself actionable under § 1983 . . . ." *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994). Given that false *charges* are not by themselves actionable, incorrect statements in an otherwise *accurate* disciplinary charge—in a disciplinary charge to which the offender *admitted*—cannot by themselves be the basis for a claim of a violation of constitutional rights. Thus, to the extent that Plaintiff is seeking relief based on the inclusion of false information in the disciplinary charges or incident reports, he has failed to state an actionable cause of action.

By contrast, evidence of false disciplinary charges coupled with evidence of improper motive in making that false charge—for example, a showing that the false charges were made in retaliation for a prisoner's exercise of First Amendment rights— may constitute a basis for establishing liability under § 1983. *Id*. But, in this case, there is

no evidence in the record tending to show that the officers acted with such a retaliatory (or otherwise unlawful) motive. Indeed, claims of retaliation make little sense. For example, it is hardly exculpatory for Plaintiff that he used his forearm, rather than forehead, to knock a correctional officer into the wall, and Kintu would have had little reason to intentionally falsify his report to state that one type of assault rather than the other had occurred.

Any claims premised on false information on reports made by prison officials following the altercation fail. Therefore, Defendants' motion for summary judgment should be granted on these claims.

###    E.    Defendant Meyer

Defendant Meyer did not *himself* use force against Plaintiff. Nevertheless, Plaintiff brings excessive-force claims against Meyer on two grounds. First, Meyer authorized and directed Demulling to spray Plaintiff with chemical irritant; thus, Plaintiff argues that Meyer is responsible for Demulling's use of excessive force against him in spraying the chemical irritant. Second, Meyer observed as other officers restrained Plaintiff in the observation cell; insofar as Meyer could have prevented the other officers' use of excessive force, argues Plaintiff, Meyer himself should also be held responsible for that use of excessive force.

Plaintiff's claims against Meyer are derivative of his claims against the other Defendants and therefore ultimately fail for the same reasons as explained above. A reasonable factfinder could not conclude that Demulling's use of chemical irritant amounted to a constitutional violation; accordingly, any direction by Meyer likewise

cannot amount to a constitutional violation. Similarly, this Court has already concluded that there is insufficient evidence to reasonably conclude that the use of force by Kintu, DeChene, Demulling, and Ricci while restraining Plaintiff was excessive under the circumstances. Thus, Meyer cannot be held liable for failing to intervene when there was no excessive force. Summary judgment should be granted in Meyer's favor.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT**:

1.     The motion for summary judgment of Defendants Emmanual Kintu, Nick DeChene, Dan Meyer, Tim Demulling, Aoun Noor, John Spielman, John Ricci, and Chris Roth (Doc. No. 63) be **GRANTED**; and

2.     This matter be **DISMISSED WITH PREJUDICE**.

Dated: January 28, 2019.                    *s/ Becky R. Thorson*
                                            BECKY R. THORSON
                                            United States Magistrate Judge

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report within **fourteen days**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).